In re Walter LEWSADDER, dba
Satellite Company, Debtor.

TOTAL TELEVISION, INC., an Oregon corporation, Plaintiff,

v.

Walter LEWSADDER, Defendant.

Bankruptcy No. 686–07071–W7.

Adv. No. 686–6015–W.

United States Bankruptcy Court,
D. Oregon.

March 25, 1988.

Thomas W. Swint, Grants Pass, Or., for debtor/defendant.

James C. Farrell, P.C., Roseburg, Or., for creditor/plaintiff.

## MEMORANDUM OPINION

POLLY S. WILHARDT, Bankruptcy Judge.

The plaintiff (hereinafter Total Television) filed a complaint against the debtor, Walter Lewsadder (who did business as Casey Distributing) alleging its claim of $8,168.04 [1] arising from the issuance of eight checks drawn against insufficient

funds to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) [2]. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

The debtor retailed satellite signal receivers and antennas in Grants Pass, Oregon. Total Television was one of the debtor's principal suppliers and the debtor needed its merchandise to be able to continue to make sales. The debtor would phone an order to Total Television. Total Television would ship it to the debtor by United Parcel Service. Upon receipt of the merchandise the debtor would write a check to Total Television and give it to UPS. UPS would route the check through its Portland office and send it by mail to Total Television.

Prior to October, 1985 the debtor wrote two checks to Total Television which were dishonored. When Mr. Szymanski, Total Television's manager, called the debtor and told him of the bad checks the debtor told him to present them again and they would be honored. On the second presentment they were honored. With this exception, prior to October, 1985 the parties had a good business relationship. In September, 1985 Grants Pass newspapers announced television signal "scrambling" was imminent. This scrambling would prevent signal reception by satellite equipment. The debtor's sales started to drop suddenly in October, 1985.

The debtor testified he alone wrote the business checks and made the bank deposits. He described himself as the world's worst bookkeeper. His standard bookkeeping procedure consisted of notations in his checkbook. He kept a running balance of checks written and deposits made. As part of that calculation he added amounts which he thought would be arriving shortly as sold satellites were installed.[3] He would

---

1. The pre-trial order filed by the parties is internally inconsistent. It indicates plaintiff is claiming $8,858.05 to be nondischargeable. It also lists the individual check amounts, including the one for $1,219.08. They total $9,058.04. The check exhibits verify the check amounts. The parties stipulated the defendant is entitled to a credit of $890 for returned merchandise. At trial the court ruled the amount at issue on

one of the checks was $1,219.08. $9,058.04 − $890 = $8,168.04.

2. All statutory references are to the Bankruptcy Code 11 U.S.C. § 101 et seq. unless otherwise indicated.

3. When a sale was made the debtor required immediate payment of one-half the price with

call his bank regularly to verify his checking account balance. He stated he did this to see whether the checks he intended to write that day would be covered. This indicates he did not take into consideration the effect of any time lag between check execution and presentment. On the other hand he testified he would, rather commonly, write a check for an amount in excess of the then present bank balance and count on four to five days before presentment in order to deposit sufficient funds, which he believed would be available from sales, to cover the check. He testified that upon his inquiry, agents of UPS had told him it would take five to six days for his checks to Total Television to clear his account.

The debtor testified when he began to get calls from Total Television about bad checks towards the end of October he intended to cover them. He believed he would soon have sufficient income from sales to cover checks being re-presented plus new checks which he continued to write. Sales continued to drop precipitously and the debtor filed bankruptcy on January 17, 1986.

The following checks are at issue:

| Date Written | Amount Payable to Total Television |
|---|---|
| 10–04–85 | $1,409.44 |
| 10–07–85 | $1,747.15 |
| 10–11–85 | $1,219.08 |
| 10–15–85 | $1,600.99 |
| 10–17–85 | $ 167.64 |
| 10–18–85 | $ 778.47 |
| 10–21–85 | $1,603.18 |
| 10–22–85 | $ 532.10 |

The debtor's October bank statement shows the following NSF charges:

| Transaction Date | | | | Amount |
|---|---|---|---|---|
| 10–02–85 | US Bank | NSF/OD Chg | | $10.00 |
| 10–14–85 | US Bank | NSF/OD Chg | | $10.00 |
| 10–16–85 | US Bank | NSF/OD Chg | | $10.00 |
| 10–17–85 | US Bank | NSF/OD Chg | | $20.00 |
| 10–21–85 | US Bank | NSF/OD Chg | | $10.00 |
| 10–25–85 | US Bank | NSF/OD Chg | | $40.00 |
| 10–28–85 | US Bank | NSF/OD Chg | | $20.00 |
| 10–29–85 | US Bank | NSF/OD Chg | | $50.00 |
| 10–30–85 | US Bank | NSF/OD Chg | | $20.00 |
| 10–31–85 | US Bank | NSF/OD Chg | | $10.00 |

The record shows 20 NSF checks at $10 per check in October. An employee of the bank testified it customarily sent notice of the balance due three or four days later upon an NSF check by mail to the drawer within 24 hours of the bank's refusal to honor. These notices indicated the number and amount of the check not honored. The monthly bank statement does not identify the specific checks dishonored on each date. The NSF notices the debtor received from the bank were not placed in evidence nor was the debtor able to remember when he first knew that a check written to Total Television in October had been returned for insufficient funds.

The October bank record shows the debtor made widespread deposits during the month which totaled $17,173.14.

From October 4, 1985 through October 22, 1985, the period covered by the checks at issue, many checks the debtor wrote, both in September and in October, were honored.

Even with the October deposits and although numerous checks were not honored, the debtor's account was overdrawn by $318.80 at the end of October.

There was unrebutted testimony that because of the routing of Total Television checks through Portland Mr. Szymanski did not receive notice from his bank of the debtor's first dishonored check in October until after the order of October 22, 1985, had been filled. Upon receipt of the first dishonored check he called Mr. Lewsadder, informed him of it and asked him what the circumstances were. The debtor told him to redeposit the check and it would be covered. As each dishonored check arrived the same conversation took place. The debtor did not tell Mr. Szymanski why there was a problem but continued to assure him the money would be in the account to cover both the NSF checks on re-presentment and the Total Television checks executed but not yet presented. The parties continued to do business in November, 1985. During that period Total Television required certified check or cash for merchandise sent to Mr. Lewsadder.

In the Ninth Circuit the elements which a creditor must prove, by clear and installation.

convincing evidence [4], to prevail under 11 U.S.C. § 523(a)(2)(A) are:

(1) The debtor made the representations;

(2) That at the time he knew they were false;

(3) That he made them with the intention and purpose of deceiving the creditor;

(4) That the creditor relied on such representations;

(5) That the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

*In re Houtman,* 568 F.2d 651, 655 (9th Cir.1978).

■ Total Television has met its burden with regard to elements four and five. It provided merchandise for which it was not paid because the debtor issued checks, ultimately dishonored, in payment. Total Television had no reason to believe, through past dealings with the debtor, that the debtor would not pay for the orders he placed. And it did not receive notice in October in sufficient time to require cash or certified check from the debtor for any of the October orders filled. It took remedial steps to limit its damage when it did receive such notice.

In many § 523(a)(2)(A) actions involving nonsufficient fund checks, the difficulty of proof for the creditor centers on elements two and three.

For this court the difficulty in applying the law in the Ninth Circuit to the facts of this case commences with element number one. What representation regarding payment does a drawer make when he writes a personal check in exchange for goods or services? This question was addressed by the United States Supreme court in *Williams v. U.S.,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) where it stated:

Although petitioner deposited several checks that were not supported by sufficient funds, that course of conduct did not involve the making of a "false statement," for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." Petitioner's bank checks served only to direct the drawee banks to pay the face amounts to the bearer, while committing petitioner to make good the obligations if the banks dishonored the drafts. Each check did not, in terms, make any representation as to the state of petitioner's bank balance. As defined in the Uniform Commercial Code, a check is simply "a draft drawn on a bank and payable on demand" § 3–104(2)(b), which "contain[s] an unconditional promise or order to pay a sum certain in money," § 3–104(1)(b). As such, "[t]he drawer engages that upon dishonor of the draft and any necessary notice of dishonor or protest he will pay the amount of the draft to the holder." § 3–413(2).

*Williams,* 458 U.S. at 284–285, 102 S.Ct. at 3091–3092.

The court in *Williams* made this statement while considering whether the writing of nonsufficient fund checks was a part of conduct proscribed by a federal criminal statute. As pointed out in *In re Burgstaler,* 58 B.R. 508, 512 (Bankr.D.Minn.1986), although the *Williams* dicta did not arise in a bankruptcy context its language has led some bankruptcy courts to hold that upon issuance of a check the debtor makes no representation that his bank will honor it upon presentment. *See, In re Paulk,* 25 B.R. 913, 917 or 919 (Bankr.M.D.Ga.1982); *In re Hunt,* 30 B.R. 425, 437–438 (M.D. Tenn.1983); *In re Younesi,* 34 B.R. 828, 830 (Bankr.C.D.Cal.1983); *In re Hammett,* 49 B.R. 533, 535 (Bankr.M.D.Fla.1985).

In the Ninth Circuit, however, the Bankruptcy Appellate Panel, in a case decided after *Williams,* but in which *Williams* was not discussed, held the tender of a check is an "implicit representation" that it is good. *In re Kurdoghlian,* 30 B.R. 500, 502

---

4. *In re Dougherty,* 84 B.R. 653, 656, (Bankr. 9th  Cir.1988).

(Bankr.App. 9th Cir.1983).[5] This court finds when Mr. Lewsadder tendered his checks to Total Television he was representing he had sufficient funds in his account to cover them. The evidence has shown this representation to be false.

The second element involves the factual question of knowledge. What *kind* of knowledge the plaintiff must prove the debtor had at the time he made the false representation depends on the nature of the false representation. *Kurdoghlian* requires proof that the debtor knew at the time he tendered the checks they were not good. The court has reviewed the evidence and finds it is not possible to determine whether the debtor actually knew, at the time he executed each check at issue, if there were insufficient funds to cover them. During the month of October there were 38 withdrawals and 17 deposits on the account. The debtor's meager and misleading bookkeeping and his failure to allow for outstanding checks when obtaining a bank balance would have produced an inaccurate net balance at any point in time.

■ Deposits and withdrawals on the account for October show that on October 4 the debtor issued his first bad check to Total Television for $1,409.44 and two other checks totaling $740.09 when the bank balance was $1,108.12. He wrote no checks on the 5th or 6th. On October 7 he issued his second NSF check to Total Television for $1,747.15. He also wrote two other checks for $266. On that day he deposited $1,500.75. After deposit the bank balance was $2,608.87. On October 8 the debtor wrote four checks totalling $2,520.05. On October 9 he wrote three checks totaling $2,737.68. On October 9 he made a deposit of $165. On October 10 he wrote at least two checks for $1,216.99 and made no deposits. On October 11 the debtor issued his third NSF check to Total Television for $1,219.08. He also wrote another check for $173.50 and made two deposits of $2,495. The balance in the account on October 11 after the deposits was $3,016.88. At the end of the day of October 14 the account had its first debit balance in October of <$505.33>. On October 15 the debtor deposited $1,250 and wrote his fourth NSF check to Total Television for $1,600.99. He also wrote at least one other check for $434. On the morning of October 17 the bank balance was $39.17. The debtor deposited $1,305 and wrote his fifth NSF check to Total Television for $167.64. He also wrote another check for $379.25. On the morning of the 18th the bank balance was $72.22. The debtor deposited $1,600 and wrote his sixth NSF check to Total Television for $778.47. On the morning of October 21 the bank balance was $51.72. The debtor made deposits of $1,500 and wrote his seventh NSF check to Total Television for $1,603.18. On the morning of October 22 the bank balance was $432.13. The debtor deposited $1,000 and wrote an eighth NSF check to Total Television for $532.10. That day he wrote at least one other check for $210.87. These figures support the debtor's admission he often wrote checks knowing he had insufficient funds at the time of execution to cover them and that he did not take into account outstanding checks when he wrote

**5.** The appeal in *Kurdoghlian* was not from a bankruptcy court ruling out of the District of Oregon. The Bankruptcy Appellate Panel has held its decisions are binding on all bankruptcy courts in the Ninth Circuit. *In re Windmill Farms, Inc.,* 70 B.R. 618, 622 (Bankr.App. 9th Cir.1987). It has made this statement within the context of a ruling from an Oregon bankruptcy court. *In re Crook,* 79 B.R. 475, note 3, at 477 (Bankr.App. 9th Cir.1987). This court believes there were at least two interrelated Congressional purposes in enacting 28 U.S.C. § 158(b) which authorized establishment of circuit-wide bankruptcy appellate panels. One was to re- lieve district courts from appeals in a specialized area of the law. The second was to encourage the creation of a circuit-wide uniform body of bankruptcy law. Although it has no authority to support its position other than the holdings of the Bankruptcy Appellate Panel itself, because it supports the creation of a body of uniform bankruptcy law in the Ninth Circuit this court believes it should be bound by the *Kurdoghlian* decision. The Oregon District Court has, in dicta, recently stated a Bankruptcy Appellate Panel decision arising from another district would not be binding on it. *In re Vanasen,* 81 B.R. 59, 62 (D.Or.1987). This court concurs.

new ones. They also bolster his statement he tried to cover checks he had written with fresh deposits. A cursory glance at the figures reveals the checks the debtor was writing were far in excess of deposits being made. As he alone wrote checks on and made deposits into the account he should have known this. Meanwhile he continued to receive NSF notices from the bank. Mr. Lewsadder testified that right to the end of his business he believed he could recoup his losses through sales and pay his creditors. Yet the figures which had to have appeared, even in his meager bookkeeping system, upon brief analysis would have told him otherwise. Either he chose not to make the analysis or, upon making it, chose to ignore it. The court concludes either alternative demonstrates Mr. Lewsadder issued checks with a reckless disregard as to whether or not they would be good. Reckless disregard for the truth satisfies the element of knowledge. *In re Houtman,* 568 F.2d at 656.

The third element the creditor must prove is that the debtor knowingly made the false representation with an intent to deceive the plaintiff. The deception with which the court is concerned is as to the matter represented. If one finds, for purposes of nonsufficient fund check proceedings brought under § 523(a)(2)(A) that the germane representation is that a check tendered in payment is good and if the evidence supports a finding this representation was false and the debtor knew, or should have known it was false, logic forces one to find the debtor had an intent to deceive *as to the soundness of the checks he issued. Kurdoghlian* holds this is a sufficient intent to deceive to support a finding of nondischargeability.

Under *Kurdoghlian* I find the debtor acted with intent to deceive when he tendered the dishonored checks to Total Television. The creditor having proved each element by clear and convincing evidence, I find, under *Kurdoghlian,* the debt of $8,168.04 should not be discharged. I reach this conclusion with reluctance.

Under the facts of this case this court believes the debtor always intended to pay Total Television for the merchandise it shipped him. He customarily ran his business by writing checks "on the float." He had a poor bookkeeping system. He was able to stay out of NSF check trouble until his business began to drop off precipitously in the month in which the checks at issue were written. He tried to cover the checks written with regular deposits. After he learned of the bad checks he continued to discuss repayment with Total Television.

■ Because of a lack of cash flow Mr. Lewsadder was unilaterally attempting to change his business relationship with Total Television from one of cash on delivery to an open account. These actions involved a form of misrepresentation about his present ability to pay which I do not condone. This court, however, believes tender of a check in payment of goods or services should not, in and of itself, be treated as a representation within the meaning of § 523(a)(2)(A). This court believes that a knowing false representation as to the present state of one's bank account simply does not rise to the degree of "moral turpitude" the Ninth Circuit Court of Appeals requires for a finding of fraud under § 523(a)(2)(A). *Wright v. Lubinko,* 515 F.2d 260, 263 (9th Cir.1975); *In re Taylor,* 514 F.2d 1370, 1373 (9th Cir.1975).

The representation in *Kurdoghlian* that tender of a check is a representation that the check is good is an "implicit representation." Yet the Bankruptcy Appellate Panel recently refused to adopt a theory of implied representation as to the ability and intent to pay for goods or services charged on a credit card. It recognized that adoption of a theory of implied representation runs contrary to the principle that the creditor prove every element of a dischargeability action by clear and convincing evidence. *Dougherty,* 84 B.R. at 656.

■ A party cannot be found to have an intent to deceive as to a future fact. *W.*

*Prosser, The Law of Torts* at 728 (4th ed. 1971). Thus, for purposes of § 523(a)(2)(A), a drawer must be found to have misrepresented the state of his account at the time a check is written.[6] Considering the time lag which often occurs between execution and presentment of a check it could be difficult to find a creditor reasonably relied on such a representation when he attempted to negotiate the check in payment. However, *Kurdoghlian* has established the law in the Ninth Circuit under § 523(a)(2)(A) in the context of non-sufficient fund check cases and this court abides by it.

This memorandum opinion contains the court's findings of fact and conclusions of law and pursuant to Bankruptcy Rule 7052 and they will not be separately stated.

An order consistent herewith shall be entered.

### ORDER

This court, having entered its Memorandum Opinion in the above-entitled proceedings, and based thereon,

IT IS HEREBY ORDERED that Total Television, Inc., shall have judgment against Walter Lewsadder in the amount of $8,168.04 plus interest from date of judgment until paid in full; and

IT IS FURTHER ORDERED the debt owed to Total Television, Inc., by Walter Lewsadder shall not be discharged by bankruptcy proceedings.

---

6. The *Kurdoghlian* court did not address whether the representation was that the check was good on execution or would be good on presentment. The facts of that case suggest the former.