DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**COSTA INVESTORS, LLC,**
Appellant,

v.

**LIBERTY GRANDE, LLC** and **MOSES BENSUSAN,**
Appellees.

No. 4D21-2676

[December 21, 2022]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Keathan B. Frink, Judge; L.T. Case No. CACE 18-11130 (12).

Victor K. Rones of the Law Offices of Victor K. Rones, P.A., North Miami Beach, for appellant.

Bart A. Houston of The Houston Firm, Fort Lauderdale, for appellee Moses Bensusan.

WARNER, J.

Appellant, Costa Investors, LLC, appeals the order granting final summary judgment in favor of appellee Moses Bensusan on Costa Investors' complaint alleging fraud. The court determined that Bensusan could not be liable for fraudulent representations in an investor contract, because Bensusan signed as president of the corporation and not individually. Because a corporate officer who actively participates in a fraud can be liable even while acting in a corporate capacity, we reverse the summary judgment.

## Facts

The underlying lawsuit originates out of the ownership and development of four adjacent properties (the "Costa property") that were first purchased and owned by Liberty Grande LLC ("Liberty"). Bensusan was president and the manager of Liberty and was also president of Costa Hollywood Property LLC, which was a wholly owned subsidiary of Liberty.

Costa Hollywood Property's business was to build the Costa Hollywood Hotel on the Costa Property.

On August 28, 2015, Liberty transferred the Costa Property by special warranty deed to Costa Hollywood Property. The deed was signed by Bensusan on behalf of Liberty as Grantor and recorded on September 3, 2015. Just three weeks after the transfer of the Costa property, Bensusan on behalf of Costa Hollywood retained the services of UniSource Inc. to prepare documents to raise funds through an EB-5 Investor program.[1]

Costa Investors (a group of EB-5 investors) and Liberty entered into a Loan and Security Agreement in which Costa Investors agreed to make a loan to Liberty as borrower for the development of the Costa Property. The loan agreement provided that Costa Investors would provide a loan not to exceed fifty million dollars to Liberty for financing costs related to Liberty's development of "Costa Hollywood", "a new two-building, six-level, luxury condominium-hotel development in Hollywood[.]" Pursuant to the agreement, Liberty granted to Costa Investors "a security interest, Lien and mortgage" in the "assets that comprise the Project" including "the Land and the Improvements thereon" in exchange for the loan to develop and construct the Project. The land specified in the contract was the same land that Liberty transferred to Costa Hollywood the previous month.

Bensusan signed the Agreement on behalf of Liberty. The agreement provided that the Borrower "has good, marketable and insurable fee simple title to the Land, and good title to the rest of the Project, subject to no Lien," when in fact the property had been transferred to Costa Hollywood. The agreement included a Borrower Certificate signed by Bensusan on Liberty's behalf stating that the "representations and warranties" made by Liberty in the loan agreement were "true and correct in all material respects on and as of the date hereof with the same effect as if made on the date hereof."

In Article 2.2, the agreement provided that none of the individual managers or corporate officers would be liable for the obligations of the Borrower (Liberty). However, Article 7.3 provided:

---

[1] The EB-5 program, also known as the Immigrant Investor Program, was created by the United States Congress to stimulate the U.S. economy through investment for development projects. The program allows foreign investors to gain permanent residence in the U.S. with certain investment requirements. *See* Am. Immigr. Council, *The EB-5 Visa Program: What It Is and How It Works* (Feb. 2, 2016), https://www.americanimmigrationcouncil.org/research/eb-5-visa-program-what-it-and-how-it-works.

> Liability Limitation. No members, officers, directors, employees, agents, or representatives of Borrower will have any personal liability hereunder (*except for fraud or intentional misconduct*), and Lender agrees to seek recovery of any sums due under the Loan Documents solely from the Collateral securing the Loan from time to time.

(Emphasis supplied.) After execution of the agreement, Costa Investors loaned Liberty two million dollars pursuant to the agreements.

Liberty defaulted on the Loan and Security Agreement, at which point Costa Investors discovered Bensusan's representation that Liberty owned the Costa property was not true. When confronted with these misstatements, Bensusan admitted that there was a problem as to the ownership and the creation of Costa Hollywood. He "communicated his apologies" and stated that the "defaults and ownership of the property would be forthwith resolved[.]"

When the matter was not resolved, Costa Investors filed an affidavit in the public records alleging that it had entered into an agreement with Liberty for the development and construction of the Costa property. The affidavit was filed "in order to reflect for recording purposes" Costa Investors' interest in the property. Attached to the affidavit was the Loan and Security Agreement and four notes, each for $500,000 or two million dollars total.

After the affidavit was filed, plaintiff Costa Hollywood Property sued Costa Investors for slander of title to real property, alleging that the affidavit had false statements and was disparaging to plaintiff Costa Hollywood Property's title to the Costa property. Costa Investors filed an answer, affirmative defenses, counterclaim, and third-party complaint against Liberty and Bensusan. Among other claims,[2] Costa Investors alleged fraud as to Bensusan, fraud and conspiracy to defraud as to Bensusan, and negligent misrepresentation as to Bensusan.

In the fraud count, Costa Investors referenced the representations made "[u]nder the terms of the Loan and Security Agreement and Certification" as being fraudulent because Bensusan falsely represented that Liberty had title to the Costa property, when Bensusan knew that representation was false. Thus, Bensusan knew that Liberty could not

---

[2] The operative pleading is the second amended third-party complaint.

provide a security interest in the collateral at the time he made the representation.

In the fraud and conspiracy count, Costa Investors alleged that Bensusan was the manager and controlling principal of Liberty and Costa Hollywood Property. Costa Investors alleged that Bensusan executed the loan agreement and the certification on behalf of Liberty, and that Bensusan's representations regarding ownership of the Costa Property were known by him to be false at the time he made the representations. Costa Investors also alleged Liberty's and Bensusan's representation that a security interest in the collateral was provided by the loan agreement was false and known to be false at the time it was made. The negligent misrepresentation count repeated the claims of knowledge and alleged Bensusan negligently made the representation that a security interest in the collateral had been provided.

The prayer for relief in all three counts against Bensusan stated that Costa Investors sought damages, including special damages caused to the investors through the loss of the EB-5 investment status. Bensusan's answer denied the allegations in the complaint.

Bensusan filed a motion and an amended motion for summary judgment. He argued that Costa Investors' tort claims against him were barred by the independent tort doctrine because "[a]ll of the claims against Bensusan . . . fail[] to allege any tortious conduct separate and apart from the conduct alleged to be a breach of the Agreement" with Liberty. Even if the independent tort doctrine did not apply, the complaint "premised [counts 2, 3, 4 against Bensusan] entirely on representations or covenants made by Liberty expressly in the Agreement" to which Bensusan was not a party. Bensusan contended that case law precluded liability in his individual capacity because the contract was signed in his corporate officer capacity, and Costa Investors had not sought to pierce the corporate veil. Bensusan also maintained in the motion that clauses in the loan agreement itself precluded his liability including the clause that disclaimed any personal liability or personal guarantees for Liberty's obligations.

Costa Investors filed a response to the motion and a statement of facts with reference to evidence upon which it relied.

After the hearing, the trial court entered summary judgment for Bensusan. The trial court made several findings, including that the action arose out of the loan agreement and that Bensusan signed the agreement as an officer of Liberty. The court relied on the liability limitation of Article

2.2, as well as the contract's integration and merger clause which stated that all prior oral representations were superseded by the agreement.

The court determined that all of Bensusan's alleged improper conduct was not separate or distinct from the alleged improper conduct that was the subject of the breach of contract claim against Liberty, thus applying the independent tort doctrine. As well, the court found that Bensusan made no representation of fact prior to entry of the agreement which could support the fraud, conspiracy, or negligence claims. Thus the court concluded no genuine dispute existed as to any material fact as to Costa Investors' counts for fraud, conspiracy to defraud and negligent misrepresentation. Costa Investors appeals the final judgment.

### Analysis

This court reviews de novo a trial court's grant of summary judgment. *Boyles v. Jimenez*, 330 So. 3d 953, 957 (Fla. 4th DCA 2021); *People's Tr. Ins. Co. v. Chen*, 333 So. 3d 208, 212 (Fla. 4th DCA 2022).

The trial court incorrectly concluded that the independent tort doctrine prevented Bensusan's liability. The independent tort doctrine is a general principle of law that provides "a plaintiff may not recover in tort for a contract dispute unless the tort is independent of any breach of contract." *Un2jc Air 1, LLC v. Whittington*, 324 So. 3d 1, 3 (Fla. 4th DCA 2021) (quoting *Island Travel & Tours, Ltd., Co. v. MYR Indep., Inc.*, 300 So. 3d 1236, 1239 (Fla. 3d DCA 2020)). "This principle *only* applies, however, to the parties to the contract." *Id.* (emphasis added).

Here, as Bensusan stated below in his statement of undisputed facts and as is apparent from the loan agreement, he was only the signatory for Liberty; he was not a party to the Agreement. Accordingly, the trial court's reliance on the independent tort doctrine to determine that Bensusan was not liable was error. *See Un2jc Air*, 324 So. 3d at 3 (finding the independent tort doctrine did not apply to appellee who was not a party to the agreement).

Instead, the court should have analyzed the complaint to determine whether the evidence was sufficient to show that fraud occurred and whether Bensusan could be liable for fraud or negligent conduct when he actively participated in the fraud, even when he signed as a corporate officer.

"As a general rule, 'a false statement of fact, to be a ground for fraud, must be of a past or *existing fact*, not a promise to do something in the

future.'" *Wadlington v. Cont'l Med. Servs., Inc.*, 907 So. 2d 631, 632 (Fla. 4th DCA 2005) (emphasis added) (quoting *Vance v. Indian Hammock Hunt & Riding Club, Ltd.*, 403 So. 2d 1367, 1371 (Fla. 4th DCA 1981) (citing 27 Fla. Jur. 2d, *Fraud and Deceit*, § 24))). "[F]raudulent ('knowingly false') representations . . . of a present fact . . . constitute[] fraud in the inducement." *Prewitt Enters., LLC v. Tommy Constantine Racing, LLC*, 185 So. 3d 566, 569 (Fla. 4th DCA 2016).

The agreement and Borrower's Certificate, both signed by Bensusan on behalf of Liberty, made false statements of "existing fact." Prior to Bensusan signing those documents on behalf of Liberty, he had previously transferred title to the Costa Property from Liberty to another one of his entities, Costa Hollywood Property. The agreement represented Liberty as the owner of Costa Property which was an existing false statement of fact, and the agreement falsely purported to give Costa Investors a security interest and mortgage on the Costa Property. The Borrower's Certificate, which Bensusan also signed on behalf of Liberty, made additional false statements of existing fact, including that "all 'representations and warranties' made by Liberty in the loan agreement were "true and correct in all material respects." Thus, Bensusan was not entitled to summary judgment based upon the court's conclusion that Bensusan had not made any false statements of material fact.

The central question is whether Bensusan can be held individually liable for this fraud evidenced by the agreement and certificate when he signed as the corporate officer of Liberty. We hold that he can.

The case of *Home Loan Corp. v. Aza*, 930 So. 2d 814, 815 (Fla. 3d DCA 2006), is instructive. In *Aza*, a mortgage lender brought an action arising out of a residential loan transaction against various parties, including the president of the title services company involved in the transaction. *Id.* at 815. Against the president, the lender alleged causes of action for fraud and negligent misrepresentation. *Id.* The trial court dismissed the claims against the president, concluding that the president had signed the relevant documents in her capacity as corporate president and could not be held personally liable for any fraud or negligent misrepresentations in them. *Id.*

On appeal, the court noted that the complaint alleged that the president prepared, signed, and certified the HUD–1 settlement statement, which contained the knowingly false statements and material misrepresentations regarding the down payments by the borrower. *Id.* at 815. The Third District looked to this Court's decision in *Orlovsky v. Solid Surf, Inc.*, 405 So. 2d 1363, 1364 (Fla. 4th DCA 1981), in which we opined:

6

A director or officer of a corporation does not incur personal liability for its torts merely by reason of his official character; he is not liable for torts committed by or for the corporation unless he has participated in the wrong. Accordingly, directors not parties to a wrongful act on the part of other directors are not liable therefor. *If, however, a director or officer commits or participates in the commission of a tort, whether or not it is also by or for the corporation, he is liable to third persons injured thereby, and it does not matter what liability attaches to the corporation for the tort.* A contrary rule would enable a director or officer of a corporation to perpetrate flagrant injuries and escape liability behind the shield of his representative character, even though the corporation might be insolvent or irresponsible."

*Aza*, 930 So. 2d at 815–16 (emphasis original); *see also* 8A Fla. Jur. 2d *Business Relationships* § 348 (2022 ed.) (same); *compare with E & A Produce Corp. v. Olmo*, 864 So. 2d 447, 448 (Fla. 3d DCA 2003) (finding record did not show any competent evidence that the vice president was involved in any of the acts of the corporation, so summary judgment in her favor was proper).

The Third District in *Aza* concluded that the allegations sufficiently alleged the president of the corporation's "personal involvement" and "participation in the tortious acts which resulted in [the plaintiff's] injuries." *Aza*, 930 So. 2d at 816; *see Diversified Mgmt. Sols., Inc. v. Control Sys. Research, Inc.*, No. 15-81062-CIV, 2016 WL 4256916, *10 (S.D. Fla. May 16, 2016) (citing *Aza* for the proposition that an officer does not incur personal liability for actions of the corporation "if the president did *not* participate in the wrong") (emphasis added).

Generally, courts have applied an "active participation theory" in holding officers and directors individually liable when they actively participated in the torts of the corporation. *See* Speiser et al., 1A Am. Law of Torts § 4:24 (2022) ("[I]t appears that a director or officer may be held *directly* liable for his or her own wrongful act—as is any agent or employee or servant—such as negligence, . . . fraud, illegal or irregular issuance of securities, conversion, and the like. The cases stress participation—or at least knowledge amounting to acquiescence in the wrongful act.") (emphasis original). "Under the participation theory, the court imposes liability on the individual as an actor rather than as an owner . . . not predicated on a finding that the corporation is a sham and a mere alter ego of the individual corporate officer." *Sereda v. Ctr. City Acquisitions,*

7

*LLC*, 222 A.3d 1161, 1169 (Pa. Super. Ct. 2019) (quoting *Vill. at Camelback Prop. Owners Ass'n v. Carr*, 538 A.2d 528, 533 (Pa. Super. Ct. 1988)). "Instead, liability attaches where the record establishes the individual's participation in the tortious activity." *Id.*

For instance, in *National Acceptance Co. of America v. Pintura Corp.*, 418 N.E.2d 1114 (Ill. App. Ct. 1981), the court considered whether the president and sole shareholder of a corporation who signed endorsements of checks for the corporation could be held individually liable for the alleged conversion of those checks when he signed them on behalf of and for the sole benefit of the corporation. *Id.* at 1116. The court determined:

> One of the purposes of a corporate entity is to immunize the corporate officer from individual liability on contracts entered into in the corporation's behalf. In contrast, although the officer is not liable for the corporation's torts simply by virtue of his office, *corporate officer status does not insulate him from individual liability for the torts of the corporation in which he actively participates.* Thus a corporate officer may be liable for the negligence of the corporation; for fraud; trespass to realty; wilfully inducing breach of contract; and conversion[.]

*Id.* at 1116–17 (internal citations omitted) (emphasis added).

The court concluded that the president actively participated by endorsing and depositing the checks and thus rendered himself individually liable for the conversion of the funds. *Id.* at 1117. The president argued that if he was held liable for the conversion that he would in effect be forced to pay a corporate debt incurred by virtue of the contract. *Id.* The court rejected that argument, stating, "[a]lthough a corporate officer is not generally liable for breach of contract, his status does not shield him from liability for tortious acts from which the breach proximately resulted." *Id.*

Similarly, Bensusan actively participated in the wrong, i.e., fraud and misrepresentation, by signing the agreement and Borrower's Certificate purporting to show Liberty as the owner of Costa Property when Bensusan had, on behalf of Liberty, previously transferred the title from Liberty to another one of his entities. Bensusan actively participated in offering to Costa Investors in the agreement a "security interest, Lien and mortgage" in the "assets that comprise the Project" including "the Land and Improvements thereon" in order to obtain loans from Costa Investors. Under the active participation theory, Bensusan can be personally liable for his fraudulent statements even though he signed on behalf of Liberty.

*See Aza*, 930 So. 2d at 815–16; *Orlovsky*, 405 So. 2d at 1364.  Otherwise, Bensusan would be able to perpetrate this flagrant fraud and escape liability behind the shield of his representative character.  *See Aza*, 930 So. 2d at 816.

The other bases for the trial court's grant of summary judgment were also incorrect.  The court relied on the contract's Article 2.2 which provided no officer liability for the performance of Liberty's obligations, together with the contract's merger clause.  Neither absolve Bensusan of liability.  First, Article 2.2 merely absolves Bensusan from any personal liability for the performance of Liberty's obligations.  Here, Costa Investors did not sue Bensusan for breach of contract but for the damages caused by Bensusan's fraud, particularly the loss of the EB-5 investment status and its investment.  The merger clause also does not apply, because Costa Investors sued for the fraudulent statements which appeared within the agreement itself.  The fraudulent statements were not misrepresentations made prior to the actual execution of the agreement.

Finally, the court overlooked the contract's Article 7.3, which provides: "Liability Limitation.  No members, officers, directors, employees, agents, or representatives of Borrower will have any personal liability hereunder (*except for fraud or intentional misconduct*)."  This provision specifically recognizes that an officer may be liable for fraud.  Bensusan cannot escape liability based upon the terms of the contract itself.

### Conclusion

The trial court erred in granting summary judgment in favor of Bensusan, because the evidence shows that a fraud was committed, and Bensusan actively participated in the fraud.  We thus reverse and remand for further proceedings.

*Reversed and remanded.*

DAMOORGIAN and CONNER, JJ., concur.

\*　　　\*　　　\*

**Not final until disposition of timely filed motion for rehearing.**

9